UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KAREN MCMAHON,

Plaintiff,

v.

REGENTS OF THE UNIVERSITY OF MICHIGAN and
MARVIN PETTWAY.

Defendants.

Case No. 14-cv-11211

UNITED STATES DISTRICT COURT JUDGE
GERSHWIN A. DRAIN

UNITED STATES MAGISTRATE JUDGE
ANTHONY P. PATTI

_____/

**OPINION AND ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [17]**

**I. INTRODUCTION**

On March 24, 2014, Karen McMahon ("Plaintiff") filed a Complaint and Jury Demand against her former employer, University of Michigan, and her former supervisor, Marvin Pettway (collectively, "Defendants"). *See* Dkt. No. 1 at 1. In her Complaint, Plaintiff raises three counts alleging that Defendants wrongfully discriminated against her and failed to accommodate her disability. *Id.* Specifically, Plaintiff asserts that her rights have been violated pursuant to Title I of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 701 *et seq.* (Count I); the Michigan Persons with Disabilities Civil Rights Act ("PWDCRA"), MICH. COMP. LAWS § 37.1101 *et seq.* (Count II); and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (Count III). Presently before the Court is Defendants' Motion for Summary Judgment [17]. This matter is fully briefed. A hearing was held on October 21, 2015. For the reasons discussed herein, the Court will **DENY** Defendants' Motion for Summary Judgment.

## II. BACKGROUND

Plaintiff began working for the University Defendant in March 2006 as a Horticulture Specialist in the Department of Plant, Building, and Ground Services ("the Department"). Dkt. No. 17 at 3. The University is divided into numerous horticultural zones, each with a horticultural crew leader, two groundskeepers, and up to five temporary workers. *Id.* at 3; Dkt. No. 22 at 2. Plaintiff was considered to be the crew leader for the zone to which she was assigned. Dkt. No. 22 at 2.

According to Defendants, the position of Horticultural Specialist is a non-supervisory position that is 80% physical labor and 20% planning and supervisory tasks. Dkt. No. 17 at 4. Defendants contend that the position requires frequent bending, lifting, and squatting to accomplish the tasks included in each zone's work plan. *Id.* at 3–5. A zone's physical tasks are to be divided up equally by the crew leader, so that each person on the crew is expected to perform every aspect of the physical task necessary to complete a job. *Id.* at 5.

Plaintiff was first injured on the job in November 2007, when digging in hard soil resulted in injuries to her elbow, neck, and back. *Id.* at 5–6. After that injury, her restrictions required that she lift no more than ten pounds, limit her neck movement, and not perform overhead work. Dkt. No. 22 at 5; Dkt. No. 17 at 6. The University accommodated Plaintiff's restrictions until she was able to return to full duty. *Id.* Plaintiff continued to suffer from health issues and took part in physical therapy from 2008 to 2012. Dkt. No. 22 at 6. In May 2012, Plaintiff took time off work upon recommendation from her physician, returning to work in November 2012. *Id.* at 6–7. Upon her return, Plaintiff's restrictions limited her to lifting no greater than five to ten pounds and avoiding tasks that would require her to squat, climb, push, or

pull. *Id*. at 7. Defendants agreed to accommodate Plaintiff's restrictions at that time and scheduled reconsideration of her restrictions for two months later. Dkt. No. 17, Ex. 12.

Defendants assert that Plaintiff was "not doing work"[1] upon her return and was merely supervising others. Dkt. No. 17 at 7–8. During her leave in 2012, the University's policy regarding temporary employees changed. *Id*. at 8. Plaintiff's crew no longer included the number of temporary workers to which she was accustomed, although Defendant Pettway provided Plaintiff with an additional worker for her crew when workers were available. *Id*. Duties for Plaintiff's position varied by season and much of the work concerned snow removal around the time she returned. *Id*. Rather than shoveling and lifting the snow, Plaintiff removed snow by pushing a shovel to a location where a snow broom could brush it away. *Id*.

On January 23, 2013, Plaintiff's physician, Dr. Asheesh Bedi, provided an updated assessment on her work restrictions. *Id*., Ex. 14. The restrictions remained essentially the same, except the restriction on lifting objects heavier than five to ten pounds was extended for another six months. *Id*. Based on his conversations with Plaintiff, Defendant Pettway expressed concern that Plaintiff's physical condition was not improving and that she may never return to full-capacity. Dkt. No. 22, Ex. MP at 22. On February 4, 2013, Dr. Bedi advised the Department that Plaintiff's restrictions would likely be permanent. Dkt. No. 17, Ex. 16.

Following a large snowfall on February 8, 2013, one of Plaintiff's temporary workers was reassigned to a different area of the campus and no other temporary workers were available to assist her work crew. *Id*. at 9. A few days later, a Department employee, Rob Doletzky, filmed

---

[1] Defendants' Motion quoted their own attorney's statement from the deposition and attributed it to Plaintiff. Dkt. No. 17 at 7–8. Plaintiff's deposition testimony indicated that she struggled with getting in and out of her vehicle, but did not include any admission of not doing the work required. Dkt. No. 22, Ex. KM at 134–36.

Plaintiff pushing snow with a shovel as part of a promotional video on the University's snow removal. *Id*. Doletzky informed the Business Manager of the Department, Kristin Brancheau, that the Plaintiff was seen shoveling snow. Dkt. No. 22, Ex. KB at 40. Brancheau felt that Plaintiff was not in compliance with her restrictions and that the Department could not continue to accommodate her. *Id*. at 41. Following the filming incident and the determination from Plaintiff's physician that some of her restrictions would likely be permanent, the Department determined on February 14, 2013 that it would no longer continue to accommodate Plaintiff's restrictions. Dkt. No. 17, Ex. 18. On February 15, 2013, Defendant Pettway called Plaintiff and told her not to report to work. *Id*.

Plaintiff's physician revised her restrictions on March 5, 2013, to only a restriction on lifting more than 15 pounds, which was expected to be permanent. *Id*., Ex. 19. Thereafter, confusion ensued within the Department. *Id*. at 10–11. On March 8, 2013, Plaintiff took part in a phone conversation with Defendant Pettway and University Human Resources representative, David Day. *Id*. at 11. The phone conversation assessed how Plaintiff could perform essential functions of her position with a restriction on lifting more than 15 pounds. *Id*., Ex. 20. The three reviewed tasks such as leaf removal, perennial upkeep, fertilizing, mulching, and snow removal, going line-by-line through Plaintiff's job description to determine how each task could be accomplished within Plaintiff's restrictions. *Id*. Plaintiff suggested utilizing truck liftgates and breaking down heavy bags into smaller, lighter buckets, as well as having other members of the work crew perform tasks like rototilling and lifting heavy equipment. *Id*. Defendant Pettway later expressed concern that trucks would not be able to access all the areas for which a liftgate may be needed to accommodate Plaintiff. *Id*. at 12. Additionally, Defendant Pettway mentioned his

concern that Plaintiff could not perform her duties without injuring herself or working outside of her medical restrictions. *Id.*, Ex. 7 at 28–29.

On March 12, 2013, Plaintiff followed up with Day, expressing her desire to return to work and a belief that she could perform the duties of her position within her restrictions if provided with reasonable accommodations. *Id.*, Ex. 21. Day claims he took part in a phone conversation with Plaintiff in which he claims Plaintiff offered to work beyond her medical restrictions, which Plaintiff disputes. *Id.*, Ex. 7 at 64–65; Dkt. No. 22 at 12. The day after Plaintiff's email to Day, Defendant Pettway discussed the matter with the University's ADA Coordinator, Carole Dubritsky. Dkt. No. 17, Ex. 22. Defendant Pettway mentioned that it was easier to accommodate Plaintiff in the winter because many physical duties were not required; however, he worried that having other crew members assist Plaintiff with her share of the physical workload could result in injuries to those crew members. *Id.* Dubritsky stated that they needed more information to proceed. *Id.*

The Department sought to clarify Plaintiff's abilities and restrictions with regard to specific job tasks from Dr. Bedi, but Bedi told the Department that he could not address the questions without a complete functional capacity evaluation. *Id.*, Ex. 24–25. Plaintiff's primary care physician, Dr. Evelynn Eccles, submitted a form indicating that Plaintiff should not lift more than 15 pounds, should only sit for two hours each day, and was limited in her ability to bend, twist, kneel, squat, operate motorized equipment, and work above the chest/shoulder level. *Id.*, Ex. 26. To address the differences between the restrictions suggested by Dr. Bedi and Dr. Eccles, the University had its own physician, Dr. Daniel Chapman, evaluate Plaintiff. *Id.* at 14. Dr. Chapman advised that Plaintiff's restrictions were to lift no more than 15 pounds, to not climb ladders, to change her position frequently, and to limit squatting and kneeling. *Id.*, Ex. 27.

Dr. Chapman thought her restrictions, though likely to be permanent, were reasonable and also felt that she could accomplish most aspects of her job's tasks without any risk of harm. *Id.*

After speaking with the Department's director in early May 2013, following the Chapman evaluation, the Department concluded that they would not be able to accommodate Plaintiff's restrictions. *Id.*, Ex. 28. In June 2013, Defendant Pettway reminded Plaintiff that she could apply for other jobs within the University system that aligned with her skills and medical restrictions. Plaintiff. *Id.*, Ex. 30. Plaintiff applied for another position with the University as a native plant specialist in April 2014, but was not chosen for the position. Dkt. No. 22, Ex. KM at 41–42. Additionally, the University required that Plaintiff apply for Social Security as part of her long-term disability leave and helped her appeal after her first application was denied. *Id.* at 189–92, 196. On May 20, 2015, the adjudication and review of Plaintiff's Social Security appeal held that she had been under a disability since May 8, 2012. Dkt. No. 17, Ex. 31.

Plaintiff describes a different set of factual circumstances that led to her current status. For example, Plaintiff asserts that her 2007 restrictions made no difference in the way that her zone's tasks were completed. Dkt. No. 22 at 5. Furthermore, she counters that when she was removed from her position in February 2013, her work restrictions were less stringent than they were when she returned to work in November 2012, following her medical leave. *Id.* at 16. In her conversations with Defendant Pettway, Plaintiff claims that she named a number of means through which she could accomplish her position's essential functions while staying within her medical restrictions. *Id.*, Ex. KM at 162–63.

It is with these contrasting positions regarding the essential functions of Plaintiff's position and the ability of Defendants to accommodate Plaintiff's restrictions that the Court must consider the instant Motion for Summary Judgment.

### III. Legal Standard

Federal Rule of Civil Procedure 56(c) "directs that summary judgment shall be granted if 'there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' " *Cehrs v. Ne. Ohio Alzheimer's Research Ctr.*, 155 F.3d 775, 779 (6th Cir. 1998). The court must view the facts, and draw reasonable inferences from those facts, in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). No genuine dispute of material fact exists where the record "taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus., Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Ultimately, the court evaluates "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52.

### IV. Discussion

Defendants argue that they are entitled to summary judgment on all of Plaintiff's claims. *See* Dkt. No. 17 at 1–2. Defendants break up their argument into two main issues: (1) Plaintiff is not a qualified individual with a disability under the ADA, and (2) Plaintiff cannot establish discriminatory discharge. Defendants incorporate their arguments for summary judgment on Plaintiff's PWDCRA and Rehabilitation Act claims into their arguments against Plaintiff's ADA claim. *Id.* at 16 n.10. The Court finds that Defendants are not entitled to summary judgment. A detailed analysis is below.

1. **Count I—Defendants Are Not Entitled To Summary Judgment On Plaintiff's Americans With Disabilities Act Claim.**

Under Title I of the ADA, employers may not "discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). "The ADA defines 'discriminate' to include the failure to provide reasonable accommodation to an otherwise qualified individual with a disability, unless doing so would impose an undue hardship on the employer's business." *Keith v. Oakland*, 703 F.3d 918, 923 (6th Cir. 2013); 42 U.S.C. § 12112(b)(5).

A plaintiff may establish discrimination by direct or circumstantial evidence. *Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 547–48 (6th Cir. 2004). If the plaintiff fails to offer any direct evidence of discrimination, the court applies the three-step legal analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under the *McDonnell Douglas* framework, the plaintiff bears the initial burden of establishing a prima facie case of discrimination. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252–53 (1981). If the plaintiff succeeds, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its action. *Id*. Should the defendant carry this burden, the plaintiff must then have the opportunity to prove by a preponderance of the evidence that the employer's reasons are not its true reasons, but rather a pretext for discrimination. *Id*.

   a. **Plaintiff Has Presented Sufficient Facts For A Trier Of Fact To Find A Prima Facie Case Of Disability Discrimination.**

To make a prima facie case of disability discrimination, a plaintiff must demonstrate that:

(i)     she is disabled within the meaning of the ADA;

(ii)    she was otherwise qualified for the position, with or without reasonable accommodation;

(iii)    she suffered an adverse employment action;

(iv)    her employer knew or had reason to know of her disability; and

(v)    her position remained open while the employer sought other applicants or she was replaced.

*See Whitfield v. Tenn.*, 639 F.3d 253, 259 (6th Cir. 2011). Here, both parties agree that Plaintiff is disabled, and that she was removed from her position because of that disability. The only issue before the Court with respect to Count I is whether she is "otherwise qualified"—i.e., whether she can perform the essential functions of the job—with or without reasonable accommodations.

### i.   There is a genuine issue of material fact as to whether Plaintiff can show that she can perform the essential functions of her job.

The ADA and its regulations provide guidelines for determining whether a job's function is "essential." Section 12111 specifies that "consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." 42 U.S.C. § 12111. Additionally, the Code of Federal Regulations provides a non-exhaustive list of factors that may be considered in determining whether a particular function is essential within the meaning of the ADA:

(i)    The employer's judgment as to which functions are essential;

(ii)    Written job descriptions prepared before advertising or interviewing applicants for the job;

(iii)    The amount of time spent on the job performing the function;

(iv)    The consequences of not requiring the incumbent to perform the function;

(v)    The terms of a collective bargaining agreement;

(vi)    The work experience of past incumbents in the job; and/or

(vii)    The current work experience of incumbents in similar jobs.

29 C.F.R. § 1630.2(n)(3).

"Whether a job function is essential is a question of fact that is typically not suitable for resolution on a motion for summary judgment." *Keith*, 703 F.3d at 926. This is due to the "highly fact-specific inquiry" that the court must engage in when determining whether physical qualifications are essential functions of a job. *See Hall v. U.S. Postal Serv.*, 857 F.2d 1073, 1079 (6th Cir. 1988). The factual analysis "should be based upon more than statements in a job description and should reflect the actual functioning and circumstances of the particular enterprise involved." *Id*. While an employer's determination of what is essential should be given "consideration," the Sixth Circuit has clarified that this consideration does not equate to "deference" or a strong presumption in the employer's favor. *Rorrer v. Stow*, 743 F.3d 1025, 1042 (6th Cir. 2014).

Defendants allege that Plaintiff's injuries amounted to "significant permanent restrictions" that were incompatible with 85–90% of her job's essential functions. Dkt. No. 17 at 8–9. Much of this argument is premised upon the undated[2] "Job Requisition Form," which lists duties and percentages totaling more than 100%, due the variance of duties by season. *Id*., Ex. 5. Additionally, Defendants include a "Functional Job Description," prepared in August 2012 by Defendant Pettway, which differs from the job requisition form upon which they rely. *Compare* Dkt. No. 17, Ex. 9 *with* Dkt. No. 17, Ex. 5. The Functional Job Description details the physical activities required in the position of Horticultural Specialist and breaks activities down by their expected frequency. Dkt. No. 17, Ex. 9. These frequencies are: "constant (67–100%)," "frequent (34–66%)," "occasion[al] (6–33%)," "rare (1–5%)," and "never." *Id*. According to the document,

---

[2] The absence of a date on this document is relevant because ADA regulations state that "[w]ritten job descriptions prepared *before* advertising or interviewing applicants for the job" are to be given consideration. 29 C.F.R. § 1630.2(n)(3)(ii) (emphasis added).

Plaintiff's position entails constant standing and walking, frequent lifting of objects between 11–20 pounds, and frequent driving, bending, twisting, and squatting. *Id*. The description further provides that it is rare that an employee would need to lift objects weighing over 20 pounds and never necessary to lift objects weighing over 50 pounds. *Id*.[3]

Plaintiff provides the 2006 job posting to which she applied, Dkt. No. 22, Ex. 14, and an updated posting for her position from 2013, Dkt. No. 22, Ex. 15. Plaintiff's exhibits lack the percentage breakdown illustrated on Defendants' form, Dkt. No. 17, Ex. 5; however, that is not the only difference between the postings. The basic function and responsibility listed in Plaintiff's 2006 job posting is as follows:

> To plan, design, coordinate, and participate in landscape projects, floriculture displays, greenhouse and nursery plant production activities; recommend the selection and care of plants for display, research, and teaching; and monitor budgets and assist in the budget planning process.

Dkt. No. 22, Ex. 14. The 2006 posting's description of duties and responsibilities focuses on activities that are not physical in nature; instead, it emphasizes the planning, design, and oversight. *Id*. The 2013 job description also focuses far more on the coordination and development of landscape planning than on physical duties, though the 2013 version includes a line regarding snow removal. *Id*., Ex. 15.

The incongruities between the "Job Requisition Form" and the three other forms describing the functions and duties of Plaintiff's position create factual uncertainty as to which form aligns closest to the actual functioning of her position. *See Hall*, 857 F.2d at 1079

---

[3] Contrary to Defendants' assertion on page 7 of the Motion for Summary Judgment, the description does not say that "Plaintiff would frequently have to lift up to 50 pounds"—the only lifting described as "frequent" are objects weighing between 11–20 pounds, some of which the Plaintiff could perceivably lift without violating her restrictions. As indicated above, lifting objects between 21–50 pounds is described as "rare," necessary in only 1–5% of the position.

(determining whether physical qualifications are essential functions of a job should "reflect the actual functioning and circumstances of the particular enterprise involved"). For example, the "Functional Job Description" does not reflect Defendants' arguments regarding the amount of time that someone in Plaintiff's position would frequently need to lift heavy items. *See* Dkt. No. 17, Ex. 9 (noting that Horticultural Specialists only need to lift items over 21 pounds 1–5% of the time).

Plaintiff also provides testimony from her former colleagues about the nature of their work and regular functions performed. Bruce Morrison, a member of Plaintiff's work crew, supports her claim that the assignment of each specific task was unimportant, so long as all the tasks on the zone's work plan were completed. Dkt. No. 22, Ex. 3, ¶ 9. However, the Court may not consider this evidence because Morrison's declaration is unsigned.[4] The Court may, however, consider the statements of Russell Downing who works as a Groundskeeper II for the University and served on the same crew as Plaintiff. Dkt. No. 22, Ex. RD at 5, 7. Downing stated that the crew would allocate tasks among themselves depending on each crew member's physical abilities and restrictions. *Id.* at 9. Downing echoed Plaintiff's claim that temporary workers were

---

[4] Plaintiff submitted an unsigned declaration from Bruce Morrison, who worked in the role of Gardner II with Plaintiff from 2006 to 2013. Dkt. No. 22, Ex. 3, ¶ 1, 7. Morrison stated that work was divided on the basis of skills, abilities, and interests, with the crew accommodating those with injuries by spreading the work around. *Id.* at ¶ 8. He did not find that Plaintiff's restrictions posed an impediment to the crew. *Id.* at ¶ 10. Defendants ask the Court to ignore Morrison's declaration because it is unsigned and was not notarized. Dkt. No. 26 at 3 n.1. While it is true that "a court may not consider unsworn statements when ruling on a motion for summary judgment," *Dole v. Elliott Travel & Tours, Inc.*, 942 F.2d 962, 968-69 (6th Cir. 1991), "28 U.S.C. § 1746 allows for 'unsworn declarations under penalty of perjury' to support any matter that legally requires an affidavit to support it." *Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 475 (6th Cir. 2002). An unsworn declaration must conform to § 1746(2): "I declare (or certify, verify or state) under penalty of perjury that the foregoing is true and correct. Executed on (date)." Here, although Morrison's declaration did include the first sentence of the essential language, it lacked the "Executed on (date)" portion and a signature that comports with the Eastern District of Michigan's Electronic Filing Policies And Procedures, R9. Therefore, it may not be properly considered as Rule 56(e) evidence.

frequently used to perform "grunt work" and that the crew would utilize truck liftgates to pick up heavy equipment. *Id*. at 9, 11.

Plaintiff's argument addresses the "consequences of not requiring the incumbent to perform the function" and the "work experience of past incumbents in the job," which are properly considered under ADA regulations. 29 C.F.R. § 1630.2(n)(3)(iv), (vi). According to Plaintiff and Downing, allocating the day's lifting duties to the most able-bodied person on the work crew was inconsequential. *See* Dkt. No. 22, Ex. RD at 9, Ex. KM at 163. The two also state that this practice of shifting lifting duties around the crew to "take care" of one another was part of their experience in the years they worked in their positions. *See id*.

Furthermore, the testimony of Denise Schroeder, who is employed in the same position as Plaintiff (Horticultural Specialist), adds additional support to Plaintiff's argument. Schroeder works a reduced schedule on Thursdays and receives Tuesdays off, allowing her crew members to perform the obligations of the work plan in her absence, based on a list created by Schroeder. *Id*., Ex. DS at 21. Downing, who worked with both Plaintiff and Schroeder, testified that there was no significant difference between the ways the two women worked with the crew. *Id*., Ex. RD at 9. Plaintiff uses these statements to support her assertion that the crew leader's physical labor was not an essential element of the position.

As a fallback position, Defendants claim that Plaintiff should be estopped from asserting an ability to perform the essential functions of her position while also making statements in her Social Security benefits application about how her injuries create challenges in caring for her personal needs. *See* Dkt. No. 17 at 19. As an initial matter, this seems rather disingenuous

because the University *required* Plaintiff to apply for disability benefits.[5] Moreover, the argument is unavailing because the Supreme Court rejected it, finding "there are too many situations in which an SSDI claim and an ADA claim can comfortably exist side by side." *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 804 (1999).

Here, the proper inquiry is whether Plaintiff has explained any apparent inconsistencies with the necessary elements of an ADA claim, considering the effect that reasonable accommodations would have on the ability to work.[6] *See id.* at 807. With regard to Plaintiff's medical condition and physical restrictions, the parties submitted evidence from three physicians, Doctors Bedi, Eccles, and Chapman, and the doctors' assessments differ enough to create a question of material fact as to Plaintiff's exact limitations. Critically, Defendants' own physician, Dr. Chapman, supported Plaintiff's contention that she could accomplish most of her job's tasks within her restrictions if accommodated. Dkt. No. 17, Ex. 27.

In light of these facts, and after reviewing the record in its entirety, the Court concludes that there are questions of material fact that make this issue unsuitable for summary judgment.

### ii. There is a genuine issue of material fact as to whether Plaintiff can identify an accommodation which would enable her to perform the essential functions of her job.

Under the ADA, the plaintiff bears the burden of proposing an accommodation that is objectively reasonable when such accommodation is necessary for the plaintiff to perform her

---

[5] When Defendants removed Plaintiff from her position, they assisted her applying for Long Term Disability leave from the University, which required Plaintiff to seek Social Security disability benefits. Dkt. No. 22, Ex. KM at 186, 192, 196. Defendants now seek to use the statements in that required submission against Plaintiff.

[6] Plaintiff did not directly address this issue in her response to Defendants' Motion, which they noted in their reply. At the hearing, Plaintiff's counsel argued that the Social Security statements bring up factual questions, upon which Plaintiff may be impeached later.

job's essential functions. *Keith*, 703 F.3d at 927; *see also E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 763 (6th Cir. 2015) (finding an employee's telecommuting proposal unreasonable when on-site job attendance was essential). Likewise, employers bear a significant burden to accommodate an employee's injuries. *Rorrer*, 743 F.3d at 1044. Accommodations must be objectively reasonable and reasonableness is generally a question of fact. *Keith*, 703 F.3d at 927.

> The ADA provides that reasonable accommodation may include:
>
> job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

42 U.S.C. § 12111(9)(B). Nonetheless, shifting an employee's essential functions to other employees for performance is not recognized as a reasonable accommodation. *Keith*, 703 F.3d at 928 (6th Cir. 2013) (citing *Bratten v. SSI Servs., Inc.*, 185 F.3d 625, 632–33 (6th Cir. 1999)).

Plaintiff provided Defendants with a list of accommodations that would allow her to work within her restrictions. Dkt. No. 17 at Ex. 21. She requested: a pick-up truck with lift, a front-end loader, scales to weigh loads, temporary workers and groundskeepers to assist with lifting, and assistance from campus occupational therapists to learn how to properly maneuver with her restrictions. *Id*. Defendants take issue with Plaintiff's plan to have temporary workers and groundskeepers continue to assist her with activities outside her weight restriction. *Id*. at 20. They argue that this assistance would function as creating a new "supervision only" Horticulturalist position, which would not be required under the ADA. *Id.*

Whether or not shifting duties is an appropriate accommodation depends on whether the tasks are marginal or essential. "Shifting marginal duties to other employees who can easily perform them is a reasonable accommodation." *Rorrer*, 743 F.3d at 1044. In *Rorrer*, the district

court erred when it prematurely determined the plaintiff, a firefighter, could not carry his burden of showing the reasonableness of his suggested accommodation: not driving an apparatus during an emergency, "a marginal function that could have 'easily' been performed by his colleagues." 743 F.3d at 1044. Nonetheless, an accommodation is not reasonable when it requires employers to accommodate individuals by shifting an essential job function onto others. *See* 29 C.F.R. pt. 1630, App. § 1630.2(o) ("An employer or other covered entity is not required to reallocate essential functions [since] . . . the assistant would be performing the job for the individual with the disability rather than assisting the individual to perform the job.").

Accordingly, whether or not Plaintiff's suggested accommodations are reasonable depends on the disputed essential functions of the position. If the trier of fact determines that daily lifting is a significant portion of the position, as Defendants allege, then the question turns on the amount of the lifting Plaintiff would be able to do with a truck liftgate versus the amount that would be added to the workload of her crew members. In *Bratten*, the Sixth Circuit determined that asking colleagues to assist with up to 20% of an auto mechanics routine duties was unreasonable. 185 F.3d at 632. In the present case, Plaintiff does not admit, as *Bratten* did, that she cannot perform a set percentage of her job's essential functions. Further differentiating from *Bratten*, Plaintiff "alleged that special tools or similar accommodations could enable [her] to perform the essential functions" of her position. *See id*. Viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could find that her proposed accommodations for the position of Horticultural Specialist are objectively reasonable.

Thus, finding that Plaintiff has presented sufficient facts to make a prima facie case under summary judgment standards, the Court will now proceed to the next step in the burden-shifting analysis.

### b. Defendants Have Not Produced A Legitimate Non-Discriminatory Reason For Their Actions

Once the plaintiff succeeds in presenting a prima facie case of discrimination, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its action. *Burdine,* 450 U.S. at 252–53. "The defendant bears only the burden of production; the burden of persuasion remains with the plaintiff at all times." *Weigel v. Baptist Hosp. of E. Tenn.*, 302 F.3d 367, 377–78 (6th Cir. 2002). Here, Defendants provide the following justification for their removal of Plaintiff from her position:

> Contrary to the allegation in her Complaint, Plaintiff was not terminated. She was allowed to take a leave of absence, which can be a reasonable accommodation. Because Defendants have met their burden, Plaintiff has the burden to show that the articulated reason is false and that Defendants acted *because* of a disability.

Dkt. No. 17 at 23–23. It is unclear how Defendants have met their burden. It appears they rely upon the assertion that because Plaintiff was not terminated, she is still an employee, and thus no adverse employment action occurred.

Nonetheless, Plaintiff need not be actually discharged to bring a disability discrimination claim—under the ADA, she need only show an adverse employment action against her due to her disability. *See Mitchell v. Vanderbilt Univ.*, 389 F.3d 177, 181–82 (6th Cir. 2004) (defining an adverse employment action). The Sixth Circuit has defined an adverse employment action similarly as a "materially adverse change in the terms or conditions of . . . employment because of [the] employer's conduct." *Mitchell*, 389 F.3d at 182 (quoting *Kocsis v. Multi-Care Mgmt.*, Inc., 97 F.3d 876, 885 (6th Cir. 1996)). Materially adverse employment actions "must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Kocsis*, 97 F.3d at 886 (quoting *Crady v. Liberty Nat'l Bank & Trust Co.*, 993 F.2d 132, 136 (7th Cir. 1993)). Additionally, the "Sixth Circuit has consistently held that *de minimis* employment actions are not

materially adverse and, thus, not actionable." *Bowman v. Shawnee St. Univ.*, 220 F.3d 456, 462 (6th Cir. 2000).

Although there do not appear to be any Sixth Circuit cases addressing the specific contention that involuntary long-term disability leave is not an adverse action, there is precedent in the Seventh Circuit. In *Timmons v. General Motors Corporation*, the court discussed this very same issue when the defendant argued that the still-employed plaintiff had not suffered an adverse employment action since he received the equivalent of his old salary while on disability leave. 469 F.3d 1122, 1128 (7th Cir. 2006). The appellate court wrote:

> That argument is a stretch. Money is not the exclusive measure of adverse employment actions. An adverse employment action must be material—more than an inconvenience—but it may take many forms. "For example, . . . a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation" all may indicate an adverse employment action. The inquiry is contextual and here there is no doubt Timmons's material responsibilities have been diminished. Placing Timmons involuntarily on disability leave was an adverse employment action.

*Id.* (citations omitted).

When Defendants placed Plaintiff on involuntary long-term disability leave, this did not appear to serve as an accommodation through which Plaintiff could continue to work within her restrictions. In fact, the accommodation Plaintiff sought was the exact opposite: to continue working the same way that she had been for the years since her initial injury. Dkt. No. 22 at 16. Like in *Timmons*, the Court's contextual inquiry finds that there is no doubt Plaintiff's material responsibilities have been diminished. *See Timmons*, 469 F.3d at 1128. Considering the facts presented by both parties, it is clear that the change in Plaintiff's employment conditions after Defendants placed her on leave was both materially adverse and significant.

-18-

Since Defendants appear to have rested their burden of production on the argument that Plaintiff was not terminated, and therefore, no adverse employment action has occurred, they have failed to meet their burden. Accordingly, since Defendants failed to articulate a legitimate, nondiscriminatory reason for removing Plaintiff from her position, the burden shifting analysis stops here and does not continue on to whether Plaintiff can prove by a preponderance of evidence that Defendants' reasons are a pretext for discrimination.[7]

## 2. Count II—Defendants Are Not Entitled To Summary Judgment On Plaintiff's Michigan Persons With Disabilities Civil Rights Act Claim.

Next, Defendants argue that they are entitled to summary judgment with respect to Plaintiff's PWDCRA claim (Count II). In this count, Plaintiff alleges that Defendants violated the PWDCRA by discriminating against her on the basis of her disability, ultimately terminating her. Dkt. No. 1 at ¶ 53.

The PWDCRA prohibits employers from discharging or otherwise discriminating against an individual with respect to the terms, conditions, or privileges of employment, because of a disability that is unrelated to the individual's ability to perform that job's duties. *See* Mich. Comp. Laws § 37.1202(b). Federal and state courts have determined that the PWDCRA "substantially mirrors the ADA, and resolution of a plaintiff's ADA claim will generally, though

---

[7] Even if, arguably, Defendants do articulate a legitimate, nondiscriminatory reason for removing Plaintiff from her position, Plaintiff does put forth facts arguing that Defendant's reasons were a pretext for discrimination. *See Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1105 (6th Cir. 2008) ("If the defendant can satisfy its burden, the plaintiff must show by a preponderance of the evidence that the proffered explanation is a pretext for discrimination."). "To establish pretext, plaintiff must show that defendants' nondiscriminatory reason: (1) had no basis in fact, (2) did not actually motivate defendant's conduct, or (3) was insufficient to warrant the challenged conduct." *Zambetti v. Cuyahoga Cmty. Coll.*, 314 F.3d 249, 258 (6th Cir. 2002). Here, Plaintiff offers Defendants' disregard of Dr. Chapman's recommendation as an example of pretext. Dkt. No. 22 at 23–24. Moreover, Plaintiff argued that there is additional evidence of pretext in Defendants' reliance on the disputed claim that Plaintiff worked outside her restrictions, evidenced only by the snow shovel incident. *Id*. at 24. Finally, Plaintiff adds that Defendants' fears about setting a precedent and the chance of another worker being injured by performing heavier work further establish pretext. *Id*. Accordingly, pretext would have been shown.

not always, resolve the plaintiff's PWDCRA claim." *Cotter v. Ajilon Services, Inc.*, 287 F.3d 593, 597 (6th Cir. 2002) (*abrogated on other grounds by Lewis v. Humboldt Acquisition Corp., Inc.*, 681 F.3d 312 (6th Cir. 2012) (en banc)); *see also Cassidy v. Detroit Edison Co.*, 138 F.3d 629, 634 n.3 (6th Cir. 1998) ("Michigan handicap and employment discrimination law essentially tracks federal law."); *Chiles v. Mach. Shop, Inc.*, 238 Mich. App. 462, 472 (1999) (finding the ADA persuasive, though not binding, in interpreting the PWDCRA).

As mentioned above, Defendants incorporate their summary judgment argument regarding Plaintiff's PWDCRA claim into their argument against Plaintiff's ADA claim. Dkt. No. 17 at 16 n. 10. Likewise, the Court's inquiry into Plaintiff's PWDCRA claim substantially mirrors its ADA inquiry, utilizing the same three-step *McDonnell Douglas* analysis and examining the facts in the light most favorable to the Plaintiff. As mentioned previously, the Plaintiff presented sufficient factual evidence for a reasonable trier of fact to find a prima facie case of discrimination. Defendants then failed to articulate a legitimate, nondiscriminatory reason for their adverse employment action, removing Plaintiff from her position and putting her on involuntary long-term disability leave. For these reasons, the Court finds that Plaintiff's PWDCRA claim survives summary judgment.

### 3. Count III—Defendants Are Not Entitled To Summary Judgment On Plaintiff's Rehabilitation Act Claim.

Finally, Defendants argue that they are entitled to summary judgment with respect to Plaintiff's Rehabilitation Act claim (Count III). In Count III, Plaintiff asserts that Defendants violated the Rehabilitation Act by discharging her based, in substantial part, on her disability. Dkt. No. 1 at ¶ 58.

In an employment discrimination case, courts are to utilize the standards used under Title I and sections 501 through 504, and 510, of the ADA to review Rehabilitation Act claims.

-20-

29 U.S.C. § 794(d); *see also S.S. v. E. Kentucky Univ.*, 532 F.3d 445, 452–53 (6th Cir. 2008) ("Apart from § 504's limitation to denials of benefits 'solely' by reason of disability and its reach of only federally funded—as opposed to 'public'—entities, the reach and requirements of both statutes are precisely the same.") (quoting *Weixel v. Bd. of Educ. of N.Y.*, 287 F.3d 138, 146 n.6 (2d Cir. 2002)); *Keith*, 703 F.3d at 923 ("Claims brought under the Rehabilitation Act are reviewed under the same standards that govern ADA claims.").

As mentioned above, Defendants incorporate their summary judgment argument regarding Plaintiff's Rehabilitation Act claim into their argument against Plaintiff's ADA claim. Dkt. No. 17 at 16 n.10. Likewise, the Court's inquiry into Plaintiff's Rehabilitation Act claim substantially mirrors its ADA inquiry, utilizing the same three-step *McDonnell Douglas* analysis and examining the facts in the light most favorable to the Plaintiff. As mentioned previously, the Plaintiff presented sufficient factual evidence for a reasonable trier of fact to find a prima facie case of discrimination. Defendants then failed to articulate a legitimate, nondiscriminatory reason for their adverse employment action, removing Plaintiff from her position and putting her on involuntary long-term disability leave. For these reasons, the Court finds that Plaintiff's Rehabilitation Act claim survives summary judgment.

## V. CONCLUSION

For the reasons stated herein, the Court will **DENY** Defendants' Motion for Summary Judgment [17].

IT IS SO ORDERED.

Dated: October 22, 2015

s/Gershwin A. Drain
HON. GERSHWIN A. DRAIN
United States District Court Judge

-21-